**Not For Publication**                                              **CLOSED**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| ANTONIO CRUZ, | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 06-1860 (FSH) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| COMMISSIONER OF SOCIAL SECURITY, | : | May 17, 2007 |
| | : | |
| Defendant. | : | |

**HOCHBERG, District Judge.**

This matter comes before the Court upon Plaintiff's motion to review a final determination of the Commissioner of Health and Human Services ("Commissioner") pursuant to the Social Security Act, as amended, 42 U.S.C.A. §405(g)(2007). The motion has been decided upon the written submissions of the parties pursuant to Fed. R. Civ. P. 78.

**I.     Background.**

The plaintiff is a 64-year-old male with an 8th grade education and prior work experience as a maintenance worker. Plaintiff alleges disability due to diabetes, hypertension, heart trouble, and psychiatric problems, with an onset date of June 14, 1997.[1] Plaintiff asserts that he is entitled to disability benefits from this date through February 15, 2002.

Plaintiff's pertinent medical history begins with his visit to the Emergency Room on March 20, 1995 with complaints of abdominal pain experienced during the prior two weeks. On

---

[1] Plaintiff's original proffered onset date was September 8, 1996; this was amended at the most recent hearing before the ALJ, when plaintiff conceded that much of his earnings in 1996 and 1997 constituted substantial gainful activity. (Tr. 307).

April 11, 1995 Dr. DeGuzman reported that plaintiff had a three-year history of diabetes, and a four-year history of heart problems. (Tr. 81). Plaintiff had previously reported that he checked his blood sugar irregularly, and progress reports from August, 1996 note elevated blood sugar levels. (Tr. 72-76).

On November 8, 1996, plaintiff was hospitalized due to a nervous breakdown. (Tr. 120-37). He reported that he had experienced auditory hallucinations for the last two months telling him to commit suicide. (Tr. 120-22). He reported that he had been paranoid and delusional for years. (Tr. 129). He was diagnosed with major depression and psychotic features. (Tr. 126). He also reported that he had marriage problems because he had become romantically involved with another woman. (Tr. 131-32). Dr. DeGuzman was contacted, and she put plaintiff on medication for diabetes and hypertension. (Tr. 127-28). The plaintiff's mood improved and he denied perception disorder or contemplating suicide. (Tr. 133). An EKG revealed left atrial dilatation with sinus rhythm with atrial premature beats and junctional rhythm; an EKG a few days later revealed left fascicular block but no other problems. (Tr. 143-45). The plaintiff was also treated for right inguinal hernia repair while he was hospitalized. (Tr. 137-38).

Progress notes from 1997 noted wide changes in plaintiff's blood sugar, and treatment with Paxil, Ambien, Glucophage, Glyburide, and Valium. An exercise stress test noted that the plaintiff achieved a maximum workload of 7 METS; the test was terminated due to fatigue. (Tr. 79).

Consultative examiner Dr. Zeiguer saw plaintiff on March 17, 1998; plaintiff had driven himself to the interview. (Tr. 90). Plaintiff reported that he had quit his maintenance job with the Newark Housing Authority due to heart and nervous problems. *Id.* He stated that for the last

two years on the job he had nervous attacks where he would break into crying or simply leave; the plaintiff partially attributed this to his conflicts with a female foreman. *Id*. Plaintiff stated that he was being treated by a Psychiatrist, Dr. Lizardo. *Id*. The plaintiff also reported a psychiatric hospitalization in October of 1997, during which time he was crying constantly and breaking objects; this crisis was provoked by his affair with a co-worker, for whom he later left his wife. *Id*. The plaintiff also reported a history of alcohol abuse that had been in remission for ten years. (Tr. 91). Plaintiff stated that he could not work due to his heart trouble and because supervision tended to make him depressed. (Tr. 92).

Dr. Zeiguer reported that plaintiff was well-groomed, and established good eye contact and emotional rapport. (Tr. 91). Plaintiff appeared to be of normal intelligence, and was logical and reality-oriented. *Id*. Plainitff stated that his medications stabilized his mood such that he did not have crying fits and was able to sleep through the night. *Id*. Plaintiff reported a normal social life with his girlfriend. *Id*. Dr. Zeiguer stated that plaintiff was able to understand social expectations, and that plaintiff showed concentration adequate to perform simple, repetitive chores. (Tr. 92). Dr. Zeigeuer gave plaintiff a fair psychiatric prognosis. *Id*.

On March 19, 1998, consultative examiner Dr. Abraham examined plaintiff. (Tr. 93-95). Dr. Abraham reported that plaintiff was cooperative and attentive. (Tr. 94). Plaintiff was anxious and sweating, with a blood pressure of 150/90, but his visual acuity was good. *Id*. Plaintiff was diagnosed with atypical chest pain, hypertension, and diabetes. (Tr. 95).

In a June 3, 1998 evaluation of plaintiff, non-examining state agency medical consultants found that plaintiff could perform medium work and execute all postural functions. (Tr. 99-106). Plaintiff's mental and emotional impairments were found to be not severe by a DDS physician.

(Tr. 107-115).

On February 28, 1999 Dr. DeGuzman stated that the plaintiff could lift and carry 10 to 15 pounds, and could stand or walk for a half hour at a time in an 8-hour work day. (Tr. 155-58). Dr. DeGuzman stated that plaintiff could not crouch, but could climb, balance, stoop, kneel, and crawl occasionally. *Id*.

Dr. Lizardo stated in a March 19, 1999 report that as of November 13, 1997, plaintiff's depression and anxiety had subsided, and psychotic symptoms had not recurred. (Tr. 147-150). Dr. Lizardo stated that plaintiff had fair ability (seriously limited but not precluded) in judgment, dealing with stress, maintaining attention, understanding, remembering, maintaining emotional stability, and being reliable. *Id*. Good ability was noted in following rules, relating to co-workers, dealing with the public, interacting with supervisors, functioning independently, understanding, remembering and observing simple instructions, and relating predictably in social situations. *Id*.

Plaintiff underwent serious heart surgery in January of 2001. He had unstable angina and congestive heart failure, and stenosis of six arteries. Progress notes in 2001 noted continuing fluctuation in blood sugar levels; plaintiff was instructed to watch his diet. Plaintiff reported swollen feet and lower abdominal pain that was quickly resolved. An ECG from February 20, 2002 noted an ejection fraction of 60% with mild aortic leaflet and mitral annular calcification with normal leaflet opening and no valvular regurgitation. In a March 12, 2002 report, Dr. Melfi noted that plainitff reported polyuria, polydypsia and intermittent blurred vision, but that an eye doctor had told him he did not need laser therapy. An April 2002 report noted that plainitff was finally following his diet, but was refusing insulin. In a July 12, 2002 Report of Contact, plaintiff

noted that he was not in therapy, was not being treated for depression, and was not on medication for depression. A July 29, 2002 report by Dr. Zuniga, a non-examining state agency consultant, found that plaintiff could perform light work.[2]

## II.     Procedural History.

Plaintiff first filed an application for Disability and Social Security Benefits on August 26, 1997, alleging disability since September 8, 1996 because of heart problems, nervous problems, and diabetes. The application was denied initially and on reconsideration. The case was heard before Administrative Law Judge (ALJ) John Farley, who issued a decision denying benefits on May 14, 1999. (Tr. 12-18). The Appeals Council denied review of the ALJ's decision (Tr. 4-5), and plaintiff appealed to the United States District Court for the District of New Jersey. This court reversed the ALJ's decision and remanded for further administrative action on October 10, 2003.

On December 11, 2003, the Appeals Council noted that after plaintiff's heart surgery, he had subsequently reapplied for Disability Insurance Benefits in 2002, resulting in a finding that he was disabled as of February 16, 2002. The Appeals Council upheld this disability determination and vacated the prior ALJ decision, remanding for a determination of whether plaintiff was disabled prior to February 16, 2002. On remand, ALJ Michael Noorigian found that plaintiff was disabled as of September 8, 1996. (Tr. 203-33).

On February 24, 2004 the Social Security administration per Steven DeMarco reopened plaintiff's case in light of evidence that plaintiff's earnings in 1999 and 2000 were substantial

---

[2] Documentary information for this period of plaintiff's medical history was not included in the record on appeal, but it is referenced in the opinion of ALJ Lissek below.

gainful activity; plaintiff had been employed by Shop-Rite for most of the term of his alleged disability. (Tr. 244-45). Plaintiff's employment records at Shop-Rite and the Newark Housing Authority were subsequently subpoenaed pursuant to an order of the Appeals Council (Tr. 237-38); the records showed that the plaintiff was working at presumptive levels of substantial gainful activity during much of his alleged disability period. A new hearing was held before ALJ Michal Lissek, who issued a February 7, 2005 decision holding that plaintiff was not entitled to Social Security Benefits. (Tr. 212-26). Plaintiff appeals the decision of ALJ Lissek to this court, asserting he was disabled from June 14, 1997 to February 15, 2002.

**III.**     **Standard of Review for Disability Benefits.**

This Court reviews the determination of the Commissioner to assess whether there is substantial evidence supporting the decision. 42 U.S.C.A. §405(g); *Consol. Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938); *Brown v. Bowen*, 845 F.2d 1211,1213 (3d Cir. 1988). Substantial evidence is "more than a mere scintilla. . . [i]t means such relevant evidence as a reasonable mind might accept as adequate." *Plummer v. Apfel*, 186 F.3d 422, 427 (D. Pa. 1999) (quoting *Consol. Edison*, 305 U.S. at 229). If there is substantial evidence supporting the Commissioner's finding, this Court must uphold the decision even if this Court might have reasonably made a different finding based on the record. *See Simmonds v. Hecker*, 807 F.2d 54, 58 (3d Cir. 1986).

**IV.**     **Standard for Finding of Disability.**

An individual may be entitled to Social Security Benefits upon a finding of disability by demonstrating that he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. §423(d)(1)(A). A disabling impairment is defined as "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§423(d)(3) and 1382c(a)(3)(D). An individual will be found disabled only if the impairment is so severe that he is not only unable to do his previous work, but cannot, considering his "age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner uses the following five-step analysis to determine whether an individual is disabled:

Step One: Substantial Gainful Activity. The Commissioner first considers whether the individual is presently engaged in substantial gainful activity. If so, the individual will be found not disabled without consideration of his medical condition. 20 C.F.R. §§404.1520(b) and 416.920(b).

Step Two: Severe Impairment. If the individual is not engaged in substantial gainful activity, he must then demonstrate that he suffers from a severe impairment or combination of impairments that significantly limits his ability to perform basic work activities. 20 C.F.R. §§404.1520(c) and 416.920(c).

Step Three: Listed Impairment. If plaintiff demonstrates a severe impairment, the Commissioner will then determine whether the impairment is listed in the regulations set forth at 20 C.F.R. Pt. 404, Subpt. P, App. 1 or is the equivalent of a listed impairment. If the individual has such an impairment, the Commissioner will find the individual disabled. 20 C.F.R.

§§404.1520(d) and 416.920(d).

Step Four: Residual Functional Capacity. If the individual does not have a listed impairment, the Commissioner must determine whether the individual has the residual functional capacity to perform his past relevant work. Residual functional capacity is defined as what the claimant can still do despite his limitations. If he has the capacity to perform past relevant work, the individual will be found not disabled. 20 C.F.R. §§404.1520(e)-(f) and 416.920(e)-(f).

Step Five: Other Work. Finally, if the individual is unable to perform past work, the Commissioner then considers the individual's residual functional capacity, age, education, and prior work experience to determine if he is able to perform other work functions. If the individual cannot do so, he will be found disabled. 20 C.F.R. §§404.1520(g) and 416.920(g).

The five-step analysis to determine whether an individual is disabled involves shifting burdens of proof. *Wallace v. Secretary of Health and Human Services*, 722 F. 2d 1150, 1153 (3d Cir. 1983). The claimant bears the burden of persuasion in the first four steps, but if the analysis reaches the fifth step, the Commissioner bears the burden of proving that the claimant is capable of gainful employment other than his past relevant work and that jobs which the claimant can perform exist in substantial numbers in the national economy. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). If there is a finding of disability or non-disability at any point during the review, the Commissioner does not review the claim further. 20 C.F.R. §§404.1520(a)(4) and 416.920(a)(4).

**V.     Analysis.**

At Step One, the ALJ considered whether plaintiff's earnings during the period between June 14, 1997 and February 15, 2002 amounted to substantial gainful activity. The ALJ

determined that the plaintiff had engaged in substantial gainful activity for most of this period, which led to a finding disability at the first step. However, because plaintiff did not work from June 14, 1997 to September 1998, and because plaintiff did not work for several months after his 2001 heart surgery, the ALJ proceeded with an alternative analysis of the medical evidence during the entire period in question, showing that this evidence also supported a finding of disability.

At Step Two, the ALJ found that plaintiff's psychiatric impairment was not severe, because it could not satisfy the durational requirement. (Tr. 221). The ALJ did find that the plaintiff's diabetes, hypertension and heart disease were severe impairments. However, at Step Three, the ALJ found that these impairments did not meet or medically equal a listed impairment. At Step Four, the ALJ found that plaintiff retained the residual functional capacity to perform his past relevant work as a maintenance worker, and that plaintiff was therefore not disabled.

Plaintiff alleges that (1) the ALJ erroneously accorded less weight to the opinion of treating physician Dr. Lizardo; (2) the ALJ incorrectly found that plaintiff's psychiatric impairment was not severe; and (3) the ALJ did not properly analyze all the evidence when evaluating plaintiff's residual functional capacity.[3]

**A.    Weight accorded to the opinion of Dr. Lizardo.**

Plaintiff alleges that the ALJ erroneously rejected[4] the opinion of treating physician Dr.

---

[3] On this appeal, plaintiff does not challenge the ALJ's findings that plaintiff was engaged in substantial gainful activity during much of the period in question. This Court will therefore not address the ALJ's finding at Step One, but will address the ALJ's analysis of the medical evidence.

[4] Contrary to plaintiff's assertions, the ALJ did not reject Dr. Lizardo's opinion altogether. She relied upon it, but gave it less weight due to its inconsistencies with the record.

Lizardo and incorrectly relied on the opinion of a DDS physician.[5] An ALJ should give substantial weight to the opinion of a treating physician regarding a claimant's limitations. 20 C.F.R. §404.1527(d)(2). An ALJ may accord less weight to an opinion that is inconsistent with the rest of the evidentiary record. 20 C.F.R. §404.1527(d)(4). While the ALJ here acknowledged that the opinions of treating physicians should generally be given great deference, she gave Dr. Lizardo's opinion less weight because plaintiff was actively engaged in substantial gainful activity for the Newark Housing Authority during the time that Dr. Lizardo described plaintiff as manifesting severe psychotic and depressive symptoms that would preclude work. Moreover, the ALJ found that Dr. Lizardo's opinion could be better explained in light of the opinion of Dr. Zeiguer and the rest of plaintiff's medical history, which suggested that plaintiff's psychiatric impairment was more of a temporary adjustment disorder resulting from plaintiff's trouble with his wife, his girlfriend, and his supervisor. This Court finds that the ALJ did not improperly accord less weight to the opinion of Dr. Lizardo.

**B.    Severity of Psychiatric Impairment.**

Plaintiff alleges that the ALJ erroneously found that plaintiff's psychiatric impairment was not severe. For an individual to be eligible for disability benefits, the individual's impairment must last or be expected to last for more than twelve months. 42 U.S.C.A. §423(d)(1)(A). At Step Two, the plaintiff has the burden of showing that his impairment is

---

[5] Plaintiff argues that the ALJ should not have relied on the opinion of this unnamed state examiner (Tr. 107-15) because the examiner did not have information about plaintiff's heart condition and therefore could not properly evaluate the severity of plaintiff's psychiatric impairment. This argument is without merit; the purpose of this examiner's evaluation was to assess plaintiff's alleged psychiatric impairment, not his physical impairments.

severe.[6]  Here, plaintiff relies on the report of treating physician Dr. Lizardo, which stated that plaintiff manifested severe depressive and psychotic symptoms.

The ALJ noted that though Dr. Lizardo had diagnosed plaintiff as having psychotic symptoms, the doctor also stated that as of November 13, 1997 plaintiff's mood had improved and plaintiff was no longer psychotic.  The ALJ also noted that plaintiff has since reported that his mood has stabilized through medication (which he no longer takes), and that he has not had mental health treatment since 1997.  Giving less weight to the opinion of Dr. Lizardo, the ALJ held that plaintiff's symptoms related more to an adjustment disorder caused by plaintiff's stress with his wife and girlfriend than to a true psychotic break.  Because plaintiff's alleged onset date had been amended to June 14, 1997, the ALJ held that the duration of plaintiff's psychiatric impairment could be, at most, five months.  Because this would not satisfy the twelve-month durational requirement, the ALJ held that plaintiff's psychiatric impairment was not severe.  This Court holds that the ALJ's finding that plaintiff's psychiatric impairment was not severe is supported by substantial evidence.

### C.     **Evaluation of Residual Functional Capacity.**

Plaintiff alleges that the ALJ did not properly recite and analyze all the evidence when she evaluated plaintiff's residual functional capacity.  The Third Circuit held in *Cotter v. Harris* that an ALJ must recite all not only the evidence that supports the result, but must also recite the evidence she chooses to reject, and explain why she rejects it.  642 F.2d 700, 705-06 (3d. Cir. 1981).  The purpose of this holding is to give reviewing courts a means of knowing the basis of

---

[6] Here, the ALJ found that plaintiff's heart condition, diabetes and hypertension were severe, but that his psychiatric impairment was not severe. The analysis proceeded to the next step because the ALJ found at least one severe impairment.

the ALJ's decision. *Id.* Plaintiff alleges that the ALJ failed to acknowledge plaintiff's severe psychiatric condition in her residual functional capacity analysis, that she failed to explain how a 60-year-old man with a heart condition and diabetes could perform medium work activity, and that she did not properly explain the relationship between plaintiff's prior experience as a maintenance worker and his residual functional capacity for medium work.

Plaintiff's first two allegations here are without merit. The ALJ found in Step One that plaintiff's psychiatric impairment was not severe, and therefore she did not need to address it in a residual functional capacity analysis. Second, the ALJ did explain that plaintiff was able to work despite his impairment, in a detailed analysis of the medical evidence. (Tr. 222-23).

Plaintiff also here alleges that the ALJ did not properly explain the relationship between plaintiff's residual functional capacity for medium work and the tasks of his prior employment as a maintenance worker. When evaluating residual functional capacity, an ALJ must carefully evaluate (1) the individual's statements about his inability to meet past work requirements, (2) medical evidence establishing how the impairment limits the ability to meet demands of work, and, if necessary, (3) supplemental corroborative information, such as the Dictionary of Occupational Titles. SSR 82-62. As for plaintiff's statements about his inability to meet past work requirements, the ALJ engaged in a careful credibility analysis, finding that plaintiff's allegations were not entirely credible because plaintiff was working during much of the period in which he claimed his impairments kept him from working. Concerning medical evidence, the ALJ gave a detailed analysis and explanation of the nature of plaintiff's limitations, and ultimately adopted the conclusion of the DDS that plaintiff retained the residual functional

capacity for medium work.[7]  Finally, the ALJ noted that the plaintiff's past relevant work as a maintenance worker was classified as medium work by the Dictionary of Occupational Titles, and was therefore consistent with plaintiff's residual functional capcity.  This Court holds that the ALJ appropriately evaluated plaintiff's residual functional capacity.

## VI.     Conclusion.

For the aforementioned reasons, this Court affirms the ALJ's finding that plaintiff was "not disabled" from June 14, 1997 to February 15, 2002.  The ALJ's finding that plaintiff's psychiatric impairment was not severe is supported by substantial evidence, and the ALJ correctly recited and analyzed all the medical evidence in evaluating plaintiff's residual functional capacity.  This Court will accordingly affirm the Commissioner's denial of Social Security Disability Benefits to plaintiff.

/s/ Faith S. Hochberg
**Hon. Faith S. Hochberg, U.S.D.J.**

---

[7] Specifically, the ALJ noted that plaintiff's diabetes had not caused Listing-level diabetic neuropathy despite plaintiff's poor compliance with the diabetic diet regimen, that plaintiff's stress test results exceeded the minimum required workload, that plaintiff's heart condition and hypertension had improved after his surgery, and that he returned to work again even after the surgery.  (Tr. 222-23).

13